Brian Layton on behalf of Lion Raisins Inc. Lion Raisins Inc. is the second largest raisin processor in California. The events in question began in October of 2000 when a search warrant was served on Lion's premises and virtually all of Lion's records were seized. By the way, has an enactment been filed? Nope. Has the debarment proceedings been completed? Nope. Well, was there a debarment hearing? There's been debarment hearings. We've gone probably four different weeks and the USDA is not done with their case. You mean the hearing hasn't concluded? No. In fact, we resume again next week and then we resume in February and then we resume in May and they're on their seventh witness. They haven't completed their case and we have approximately 50 witnesses. Briefly, the ground on which the debarment is based is some kind of a false statement. Is that right? What USDA is contending that out of the thousands and thousands of loads per year that Lion has inspected by USDA, which they're required to be inspected by USDA and Lion's required to pay for that, they have found six inspection certificates where either the inspector's And that is in six different loads out of thousands of loads. Obviously, we're not here to try to address the merits of a debarment proceeding. You see, my interest is this. It seems to me in that kind of debarment proceeding that you must have seen a number of these documents in controversy here, right? Your Honor, the only thing they are required to show us are the documents with respect to the six loads that they are discussing. So what do you call these? Check sheets? What are they called? Lion. L-I-N-E, not Lion. Line check sheets. So the government's produced in the debarment proceeding six line check sheets. Is that what it amounts to? For the six loads, yes. For the six loads that are in controversy? Yes. And you haven't, I know you, there was some, I'll call it discovery, but you know, I know some line check sheets were, Lion's own line check sheets were given to you earlier, right? That's in the briefs, but you have gotten nothing further since that time. That is correct. Except for these six. Except for the six. And I assume it's your suspicion that whatever, you know, criminal proceedings may be under contemplation by the U.S. attorney in the Eastern District has to do with the same activity. From what we understand. That's your supposition. That's our supposition, but the affidavit in support of the search warrant is still under seal. I understand that. We requested to have it unsealed. That was denied by the district court. The problem with the fact that Judge Coyle ordered USDA to photocopy the line check sheets that were observed in the proceedings, the administrative proceedings, is that when USDA completes the inspection, they're supposed to fill out the line check sheet, leave a photocopy with Lion, which were seized by the government, and retain their original line check sheet. What we are asking for in our FOIA request is the USDA retained line check sheet because in the hearing we have found at least two instances where our line check sheet that they left us with does not compare with the line check sheet that USDA retained because after they gave us our copy, they added more things to it. And that's happened on two of the six loads. We are asking for a copy of our own line check sheets that USDA retained a copy of, which is the line check sheets that USDA is using for this investigation. You've gotten some of those, haven't you? What now? Haven't you gotten some of those? Not the ones that USDA has. All right. The only ones you've gotten are the ones that were seized. Yes, but not USDA's. Right. I understand that. But the ones that were seized from Lion. Right. So that would be in effect the copy you were given. The copy that we were given. Okay. But not the ones that USDA retained. I understand. Except for the six loads that we're talking about in the administrative hearing. Mr. Layton, on the copies, on the originals, is there any space or provision for the USDA to add additional information that isn't left with the Lion raisins? There is no provision for them to change, alter, and add to what they left a copy of us with. I see. And the thing is, is since we never see what they retained, we always presumed it's identical to what we had, but we have found out in this hearing they have added things. They have changed things, particularly in the remarks section, which is on the right-hand column of the line check sheet, I've provided a copy of one of Lion's as an addendum to our gray reply brief. But that's what we're seeking. All right. Now, you understand that with respect to Lion's own line check sheets, the ground for withholding on the FOIA request is the law enforcement exemption, right? You understand that? I understand that, and I understand. Yes. Okay. Well, you've been told, I assume, the reason behind that, asserting that exemption. I mean, they assert the law enforcement exemption because whatever it is, right? Do you understand the reason? The problem is... Have you been told the reason? We just say, they just say law enforcement exemption, the district court relied solely on an ex parte... On which the law enforcement, assertion of the law enforcement exemption is based. We know what the appeal officer for USDA claimed. What did he claim? The, and the claim is in our opening brief, the Dr. Clayton of USDA claimed that since Lion is being accused of falsifying inspection certificates and line check sheets, it would interfere with the law enforcement proceedings to provide us a copy of documents that they accuse us of forging and altering. Oh, no, but interfere how? Is that as far as that statement goes? Yes, exactly. All right. The, the problem with that is the fact that if they retain their original, their original inspection certificate, their original line check sheet, and provide us a copy of those, what can we do to interfere with their... We're not asking for, give us the line check sheets that you're accusing us in some criminal context or other context of, of, of altering or forging. We're asking for every one of them, thousands and thousands going back to 1991. What are we going to do? Forge and introduce copies of documents that they have the originals? We'd have to be complete idiots in requesting prison if we were to do that. What we want the documents for is to show that it is USDA inspectors... So let me ask you this question hypothetically. You think that's a valid reason? If the USDA thought, well, you don't have too much to do with them, you're going to forge them and make copies that you're going to use at some procedure. Is that a valid... No, it's not a valid... Assert the law enforcement exemption in your view? It's not a valid assertion because to claim the law enforcement exemption, they have to describe each document and showing how a release of that document would interfere with ongoing criminal investigations. The only evidence that it would interfere with criminal, ongoing criminal investigations is the ex parte, under seal, in camera declaration filed by the criminal prosecutor, which, of course, we didn't get to refute. And of course, a major portion of our opening brief and our reply brief is based upon Ninth Circuit precedent that says as much public information must be disclosed as possible before the court can ever rely on something in camera because the government has destroyed the adversary process because we cannot contest what is stated in a declaration that we haven't seen. The line check sheets were not compiled for law enforcement purposes. The B-7 exemption for law enforcement means that they have to be compiled for law enforcement purposes. Line check sheets are not compiled for law enforcement purposes. Wait a minute now. Do you have a case that supports that statement you just made? No, B-7 itself says compiled for law enforcement purposes. I know that, but do you have a case that reads that provision to mean a document that's not prepared expressly for law enforcement purposes can't be subject to the law enforcement exemption? It can if its purpose of preparing it was for later law enforcement purposes. These are just to advise us and advise USDA as to the quality of outgoing raisins. Thousands are issued every day, you know, throughout our entire industry. The court's determination, and of course, the court relied on the ex parte declaration with respect to two of our FOIA requests, Lion's own line check sheets that USDA has and the two law enforcement reports. Let me ask you about that, if I may, Mr. Layden. I don't understand under what theory you would be entitled to the inspector general's report or the market service investigator reports. Well, the court relied upon Lewis, and in our opening brief, we explain why Lewis doesn't apply because in Lewis, the defendant or the person who is subject to an ongoing criminal investigation wanted the entire criminal investigative report that would disclose witnesses, documents, the scope and extent of the IRS investigation, and in this case, the problem is, Your Honor, it could very well be exempt. The problem is before the district court could determine that it was exempt, the district court was required to read it. The district court never looked at the two investigative reports. So what we have is the court is expecting us to buy a pig and a poke based upon, well, it's an investigative report, therefore it can't be disclosed because the B-7 exemption only allows the exemption if they provide a detailed explanation as to why disclosing any portion of that report, page by page, would actually interfere with an ongoing criminal investigation. Why isn't it sufficient to say it's an investigative report and sit down? It's not a public record, this is an investigative report. Because the B-7 exemption does not allow them to just say, hey, it's an ongoing investigation, that's it. No, not that it's an ongoing investigation, but that the document itself is an investigative report. It's like a police report. Well, in Lewis, in the Lewis case, which is the court, is the case that the government relied upon and what the district court relied upon, in that case, there was a detailed affidavit by the criminal investigator detailing why the investigative report would interfere with an ongoing criminal investigation. All we know is that there were two supposed investigative reports done, prepared, one in 1999 and one in the last part of 2000, early 2001, that supposedly was an inspector general report of USDA regarding lion raisins. They said, well, it's an investigative report, therefore it's exempt. The problem is the B-7 exemption, as described in Lewis, does not allow them to simply say it's an investigative report and therefore it's exempt. And the district court cannot make its independent determination of that without looking at the report. So unless the court has further questions, I'd like to reserve the remaining part of my time for... Let me ask one question with respect to the other set of documents. That's the line check sheets on your competitors. Correct. Now, it seems to me, over the course of all these proceedings, you've been engaged in kind of a fallback process, you know, sort of asking for less and less, in other words, you know, willing to have some of the information redacted, right? Correct. What's your ultimate position as to what you want on your competitors' line check sheets? If the court looks at the addendum to our reply brief, we have provided a copy of a lion line check sheet. These are typical in the industry. We have redacted those portions which would indicate the packer name, the buyer name, any employee name, the inspector name, and all you end up with is the time that the inspection occurred and what the bare-bones analysis of what the grade, condition, and moisture of the raisins were for that particular inspection. Having those documents, the bare-bone results, does not, contrary to what we have in the Prokowski's declaration that he filed in the district court, does not provide us a competitive advantage over anything. Now, although a person who makes the FOIA request doesn't have to furnish a reason. That is correct. If you can tell me, why do you want this redacted like this? I mean, what good is it to you? Well, if you see on the top where it says moisture. Yes. They have 1, 2, 3, 4, 5, 6, 18s in a row. 18% moisture. What in a row? 18. 18, right. Okay. Six in a row and they have probably 10 altogether for these 12 inspection times. Right. 18.0 is the maximum allowed by USDA. USDA is accusing Lion of altering reports, falsifying inspection certificates. Scientifically, it is utterly impossible to get three 18s in a row, let alone seven 18s in a row, because you have 5,000 raisin producers. The raisin producers bring in their raisins. They're all at varying degrees of incoming moisture. You add moisture during the processing. It is absolutely impossible. You take these five bins of raisins and they may be at 10% incoming moisture. The next five are at 12%. Well, unless they have some secret process. Is 18 the maximum? 18 is the maximum allowed by USDA. Everybody wants to get to 18 because you got more weight, right? You can tell water. Yeah, but the thing is, is you can't tell what the moisture level is until you actually do the physical inspection. They take the raisins, they grind it up in a meat grinder, make a paste, put it in some contraption, measure the temperature, and they come out with a moisture percentage. Lyon knows it's physically impossible because Lyon, when they do their own moisture readings, which they do. Do your reports look like this, a lot of 18s in a row? About a bazillion of them. So that's the main thing you're looking for, is it? Yes, and we want to see if it's on an industry-wide basis because if USDA is. Let me ask you this. Then would that be satisfied just by some kind of random sampling? The problem is if we allow USDA to do the random sampling, they're not going to give us the ones that have 10 18s in a row. Well, you don't know that. Well, Your Honor, there are some inspectors that do a correct job. And when we get those inspectors at Lyon, they'll say you're at 18-4, you've got to rerun it and get the moisture out, blah, blah, blah. Others, Danny Dobbs and a few other inspectors that have testified against us at this hearing, how do you get so many 18s in a row? Oh, it's just happened. I understand your position on these Lyon check sheets. I think you've got to reserve the rest of your time, right? Thank you. All right. Thank you. All right. Let's hear from the government. May it please the Court. Linda Anderson for the Defendant Secretary of Agriculture. Your Honor, let me correct a few, and a particularly offending. Are you with the U.S. Attorney's Office? U.S. Attorney or from Washington? I'm with the U.S. Attorney's Office, Fresno, California, Eastern District of California. So you're a colleague of the assistant who prepared the seal declaration, right? Yes. All right. Go ahead. First of all, the plaintiff's FOIA request was not for the USDA retained copies of the Lyon check sheets. That is a filigree that evolved later in the briefing in this case. If the Court refers to the excerpts of record at both pages 5 and 20, the Court will see that several times Lyon insisted that what it wanted was copies of Lyon check sheets it had already had that USDA had seized back under the search warrant. Those are the copies that were given to Lyon at the time the inspections were made. But you understand now that what they want is, I'll call them the originals retained by USDA? Yes, that is what I understand. And there is a related case on file in the Eastern District that stayed pending resolution of this case in which they corrected their FOIA request to ask for specifically those documents. Are you objecting to that amended request in that case? I'm wondering why we're here, Your Honor. Well, I understand your point here, but let's cut to the chase. Do you object to what you now know that they're seeking? I believe it's going to have the same infirmity, whatever it is, that the criminal side has with Lyon's getting its own back. I'm not sure of that because I don't know what that infirmity is. But I think there's a problem for USDA giving any of those out. Excuse me, I'm looking at ER-9. It's got a rubber stamp number Exhibit 1. It's on the letterhead of Law Offices of Brian Layton. It says, Please provide any and all USDA Lyon check sheets performed by USDA at Lyon Raisins, Inc. and Lyon Enterprises from and including 1991 to 2000. Isn't that the originals that Judge Tashima was referring to? If you continue to look at their FOIA appeal, they clarified that at page ER-12, the appeal of this particular request, this is in the bottom paragraph, Lyon's is asking for information that once was in the possession of Lyon but seized by USDA. Well, then getting back to maybe it was Judge Thomas's question, is there a problem giving them the originals or copies of the originals of the Lyon check sheets that were performed at Lyon Raisins? I believe I do not know, but I am assuming and I cannot waive the possibility that the criminal side of my office's problem with revealing to Lyon its copies of the check sheets is going to apply as well to USDA's copies of the same check sheets. What's that problem? I do not know. You're representing the government and you're defending the government and you don't know what the position the government is taking? That is correct, Your Honor. I do not know. I believe I infer that it has to do with grand jury matters, because I'm not on the grand jury list and I think that the grand jury problem is the problem that is the reason why all of this was done in camera. Let me direct your argument to another area then. I think Mr. Layton is correct that our cases in the FOIA area require the government to file a public declaration, a bond index, something like that, but to put as much as is reasonably possible on the public record and make it available to the FOIA requester so there can be, to the extent possible, a true adversarial hearing. And here, your colleague just short-cutted the whole thing and just depended on nothing but a sealed declaration. Now, isn't that an improper procedure and shouldn't we reverse this case solely for that reason? Your Honor, this Court in the Doyle decision indicated that in the unusual case, it would be appropriate for the government to proceed with in-camera declarations. What's unusual about this case? It's an ordinary grand jury investigation, isn't it? It's an ordinary grand jury investigation where the target is using FOIA to try to find out what the grand jury is doing, I'm assuming. I've seen lots of cases like that. And the exemption is the same. But suppose I told you, because I've seen the sealed declaration, but the sealed declaration doesn't rely on the grand jury secrecy in terms of withholding the lion's own check sheets. Besides, you know, if I have this piece of paper here and it's in my custody, just because I give it to the grand jury doesn't mean it's made secret by Rule 6. My own copy is still subject to discovery, right? Now, so if I told you that the sealed declaration which I've read doesn't assert grand jury secrecy as a ground for withholding lion's own check sheets from lion, what's your response? I'm inferring that the grand jury was involved because I don't know the contents and my colleagues told me they couldn't tell me, so I don't know. Forget the grand jury. It's not in this case. You're just raising it for the first time today. I'm sorry, then. I'm speculating. Do you want us to go outside the record? Is that what the government wants us to do? No. We have to decide this case based on what you submitted to us. So you say grand jury. We have to take that off the table. That's not in this case. So what else do you have? You have to take it off the table if that's what my colleagues said. I, as I said, I don't know what they said. I'm inferring that there was some kind of reason why even the civil side of our office couldn't know, and I assumed that was grand jury. But if it's not, then I'm simply wrong in my inference. My question again, then, let me get back to my question. Why shouldn't the government have followed the regular approved procedure in this kind of FOIA case by filing a public declaration or bond index or something like that in order to put something on the public record with respect to its position? In many of the cases, Your Honor. I'm not talking about many cases. I'm talking about this case. Why didn't you do that? Well, this case doesn't involve a plaintiff trying to find out if there are investigations going on. This is a plaintiff that knows there are investigations, and he doesn't need a bond index because he knows that the documents he's asking for are these line check sheets. And we know what they have, generally have in them. We wouldn't know the content of any particular one, the numbers on a particular form, but we know what the form is. So many of the concerns that this and other courts have addressed elsewhere don't apply. These people already know there's an investigation on them. Doyle was our authority below for this in-camera procedure. I do not know beyond what the declaration you've seen says. Our procedure is okay, but it's the last step. It's not the first step, which is, you know, which is not you know. And Doyle wasn't the first thing that the government did. It says, well, we're not going to tell anybody anything. We're just going to go right to the secret proceeding. This is what you're doing here. The record only has that affidavit in it, and I don't know what it says, so I can't argue it further. Well, give me a logical reason why here. You know, here's the line check sheet. I'll just assume for simplicity it's in a duplicate. You know, the inspector fills it out, gives one copy to the line, keeps one copy for the USDA's own record. That's what we're doing right now. So the line has a copy in it. Presumably those that were seized, you know, during the search warrant raid were returned to line. Let's assume that. But so what law enforcement conceivably, what law enforcement purpose could be frustrated, legitimately frustrated, by giving the line a copy of the original that the USDA retained? I'm speculating. Speculate with me. I will speculate as follows. Suppose that Lion is no longer able to discern which of its copies of its line check sheets it forged after it was given to them by USDA. Suppose further that Lion, in bolstering whatever defense it's... Apparently the government's given them six that, you know, the government claims have been forged. So they know which those six are. Six inspection certificates which are different from the line check sheets. An inspection certificate says this load of raisins meets USDA standards. The line check sheet is a sample of the product as it's going by on the conveyor belt every 30 minutes. Suppose that further that Lion is in need of preparing other documents to bolster some defense that it has. It can no longer keep track of its own fabrications because it isn't sure at this point which of the copies it got back were edited and which were not edited by Lion. Maybe that's why, as I've said, I'm speculating, that maybe why my colleagues don't want them to see our retained copies because they don't want Lion to be in a position of further fixing things. Well, that would require your colleague to speculate. First of all, to speculate that, well, Lion's lost its own copies, right, of we'll call them the forged check sheets. And so it needs to have what I'll call clean copies of those. I mean, that in itself is speculation, isn't it? That's true. We were you. You can't base a request for a law enforcement exemption on speculation. I'm sorry, Your Honor, I thought you asked me to speculate. No, no, no. What's in a secret affidavit I haven't seen. But the reason, the very reason you're given is itself speculation. That's true. What you're saying is, you know, we can base a law enforcement exemption on speculation, right? My hope is that the affidavit, the criminal side supply, did not contain speculation. Well, frankly, it doesn't contain much. Okay. I can't address that, Your Honor. I didn't review it and I haven't been authorized to say anything. Ms. Anderson, doesn't the law enforcement exemption apply to records compiled for law enforcement purposes? Under the John Doe decision, it has to be compiled for law enforcement, but it doesn't have to have originally been compiled for law enforcement. The documents that the government now has in its possession that were seized under the search warrant are a compilation for law enforcement purposes. No, I'm not talking about the stuff that was seized. I'm talking about the stuff that was the original copy that was retained, which is Lyon's own check sheets, the originals of which the USDA kept. That wasn't originally compiled for law enforcement purposes, was it? No, I don't. I wouldn't characterize the marketing order's quality control as a law enforcement requirement, because. . . So if any John Doe citizen wants to get a copy of Lyon's or anybody else's Lyon check sheets, they'd be able to do that, wouldn't they? Well, a John Doe citizen would have the problem of it being Lyon's proprietary information, but Lyon getting copies of its own, in this case, as the Tchaikovsky Declaration indicates, when the investigation started on Lyon's, the Agricultural Marketing Service ceased its periodic purging of those records and it is retaining them for purposes of this criminal investigation. So it has them going back to 95, where it normally would only have them going back to 2,000 at this time. So I think it's fair to characterize that as a, at this point, it's compiled for law enforcement purposes because it's being held for purposes of this investigation. Well, let me get this straight. So you start off with the premise that these are completely subject to FOIA, absent any investigation. A company can go in and get its own records, right? Yes, Your Honor. The inspection records. Yes. The reason that you're saying that they're not available for, they're now subject to law enforcement exemption, and you give a copy, you leave a copy of these with the company at the time, right? I thought it was a multi-part form. Mr. Layton says it's a Xerox, but yes, they get it the very day of the inspection. And the only reason you say that they can't get the USDA copy now is that you think they might use it in a defense of their criminal case. Even though, theoretically, it's supposedly the identical document that they can get, they were given a copy at the time and have to be given a copy at the time under the regulations, right? Because they might use it for some nefarious purpose? Your Honor, I'm going to withdraw all speculation about what's in the criminal side's declaration. I just don't understand your position as a matter of law, so you've got to help me out here. I cannot help you with the criminal side's reason why they didn't want Lyons to get this information. No, he's talking about the reason you gave. In other words, that if the government suspects that the FOIA requester is going to use a document for some, you know, unlawful purpose, such as creating a forgery, that that's sufficient to invoke the law enforcement exemption. Yes. One of the cases I cited said that, in fact. I'm not sure I'm going to be able to come up with a name. I'd like to have that cited. Is it in the brief? Yes. One of the cases cited in my brief. I'm not sure that I cited it for that. I mean, you see, that's. I think basically they made a pretty good case that it's potentially exculpatory, so you're going to be required to turn it over for Brady purposes anyway. Oh, yes, Your Honor. Under Jenks, if this were a grand jury, it would be, and under Brady, it would have to go to them at the time of trial. But there's, I believe, not even been an indictment yet, so it's all investigatory stage. Well, I interrupted Judge Tishman. What's your best case on the forgery? On the forgery. You can misuse the document, and therefore, you're not going to turn over a copy of the document. Your Honor, what I, that isn't even our case. I don't know what's in the Esparte Declaration. No, no. You said you had a case that said. I was stuck. Oh, I'm sorry. What's the case? The case that said that there could be a problem with somebody fabricating. Yes. I have it, put it in my notes at the top of the case copies I have, and I can't, I can't remember what it says on the document. I can't remember. All right, you say it's in your brief, Don. But it's one of the cases you cite in your brief? Yes, if I would be happy tomorrow to send a letter with a cite to counsel and to the court. We'll look at the cases. Let me ask you then a little different question. Have you seen the so-called investigative report of the inspector general or AMS? I have seen the AMS report, Your Honor, as has Mr. Layton. It was produced to him in a redacted form in another case. But you've seen the unredacted. I have seen the unredacted report. Now, how heavily was it redacted before showing it to Mr. Layton? What was taken out, like certain names or? There were two allegations of wrongdoing, two different frauds that were described in the report. One of them was not the basis for the action that was at issue in that earlier litigation, and that entire portion of the report was redacted out. In the first part of the report, the only thing that was redacted out was the identity of the confidential informant who came to the government with the report about both of the frauds. Right. That was the only thing that was redacted, the information that might identify a confidential informant? Yes, Your Honor. Yes, Your Honor. And I believe at the time that we filed that report in that other case, we notified the court that that was all that was redacted from it. Now, in your view, was that AMS report prepared for a law enforcement purpose? Yes. Because why? We had an insider had come to the USDA with information about fraud that was being committed by Lion Raisins. All right. And the Agricultural Marketing Service sent out letters to overseas importers of California raisins asking for them. Buyers. Buyers. Yes. Overseas buyers to asking them to send in back to USDA copies of any USDA inspection certificates. Okay. At the hearing in that case, we learned interesting facts like many of these purchasers contacted Lion Raisins and said, what's going on? And Lion said, oh, it's nothing. You don't have to comply with it. Have you seen the Inspector General's report? I have not seen the Inspector General's report. I was going to be given it, and I asked first, does this have any grand jury information in it? And they said yes. And I said, well, then don't give it to me. So. How did the Inspector General get grand jury information? The Inspector General has personnel that are, I assume, working the grand jury case. They're investigators. They're law enforcement investigators that investigate fraud related to federal purse. You mean they're assisting the U.S. attorney in the investigation? Yes. I think so. They had a report I couldn't see because it had grand jury information in it. Does the OIG report, is it pre-date or post-date the AMS report as far as you know? I don't know. But you haven't seen it? No. As far as you know, is it the same subject matter as the AMS report? Well, obviously the subject matter has to do with what the grand jury is looking at, right? That's why you can't see it. Is that right? At least that's what you've been told. I was told it contained grand jury, and so I didn't want to look at it anymore. I'm not on the grand jury list. But I don't know whether it's the same fraud or different fraud or what they're looking at now. Okay. Anything else? If there are any questions about the proprietary aspect of the information. Sure. Even redacted as the report, as now the plaintiff is willing to take, the court might notice that throughout the FOIA appeal, they continued to insist that they wanted some kind of code that would denote the packer for each document, even if it didn't identify the packer. But today you said a redacted report is acceptable. So what's wrong with that? The problem is if all of that information is redacted and we could give a random sample, I don't think there's a problem. But I'm not sure. In the raisin industry, it's a small town. It's a small business. A packer who just got a big federal contract for a school lunch program is going to be beefing up on 10-pound bags of raisins in the week or two following that. And everybody knows that. So they're going to be able to tell by looking at somebody that's all of a sudden jamming out a lot of 10-pound bags of raisins. But it seems to me he's expressed today in a forthright, he didn't have to, but he told us why he was interested in the document, which is more information than you were entitled to. And given that information, certainly what's wrong with seeing the historical records of certain companies with respect to the amount of moisture percentage, the moisture rating? He doesn't want just the amount of moisture. He wants all of the numbers in the chart just redacted as some of the information that he shows from which somebody who knows the industry could infer who was packing that item. Yeah, yeah. But I think Judge Thomas's point in part is that, well, since this is historical information, inspections that happened in the past and those raisins presumably, those contracts have already been gotten, the raisins have been shipped, whatever it is. But how can that, you know, have an effect on the marketplace? We're looking at GC Micro. These records only go back three years. And over the last three years, the raisin industry has been tanking, as Mr. Troikowski's declaration establishes, price differentials under a penny a pound make or break deals. And for anyone in the industry to be able to figure out who's packing what and selling what, when that person themselves. This is past data, so you can say who packed what when in 1998 or 2000. Not today. Lion Raisins knows what bids it just didn't get. It knows what orders it just didn't get because they got somebody that bid lower. And they know what they wanted shipped, how they wanted it packed, and when they wanted it out. And they can look at those numbers and tell who got that. But who got here? Right. But these are, we're talking about plants that are 50 years old and a product whose incoming price is set as a commodity by the Raisin Bargaining Association each year coming in. And you could infer what someone's profit margin was in 1999, and it's not going to be terribly different from their profit margin in 2003. Everybody's got, except for Lion, has the same old plant. How do you infer that? Make an educated guess. What about that? Then you can tell what they're marketing these fungible products for, and you can target them selectively under bid each one of your competitors one at a time until they're gone. I'm, again, speculating. But if you compare what this Court said in G.C. Micro and what was the reason why it was appropriate for the information to be disclosed there and compare it to the facts here, they're quite different. But these are all publicly held companies. Oh, no. I'm not sure that any of these are publicly held. So let me think. Lion isn't publicly held. No, no. But I think some of the competitors are. So the matter of profit margin would be a matter of public record. Your Honor, I don't believe that there's anything in the record about who's publicly owned out there, and I'm not sure that they are. Your position, nonetheless, that even though this might be information that goes back, you know, two, three, four years, that it's still useful in terms of the marketplace in making a competitive decision today. Yes. Yeah. It's your position. Yes, Your Honor. Based upon those affidavits that were filed by the AMS marketing specialist. Yes. Yes, Your Honor. Ms. Anderson, thank you very much. Thank you. All right, rebuttal? Very briefly, Your Honor. Before you start, I want to ask you a question now. Ms. Anderson said that the redacted AMS investigative report you received only had redacted from it information that might reveal the name of a confidential informant. Do you agree with that? How do I know, Your Honor? I'm not trying to be flippant with the court. They just blacked out a whole paragraph, so I don't know what they say. But if it's a confidential informant that they claim later, he's already testified in the administrative hearing. Well, it could be another one. It could be. I don't know what's redacted. What you want is a description of why it's redacted. Yeah. What does it say? And the second report, we've never seen that one. Let me ask you about the Vaughan index problem. Ms. Anderson made the point that if you had just said, give us whatever you have on Lyons, then it would be appropriate to have a Vaughan index where you say we have document one, and it's this, and we're not going to give it out because of that, and document two is this other thing, and we're not going to give it out because of that, where they would somehow itemize the documents that they found and then what their position is on it. She says you don't need a Vaughan index in this case because you've asked for Lyons check sheets, and you've itemized them yourself. You've asked for the Lyons check sheets for Lyons. You've asked for Lyons check sheets for the competitors, and you've asked for these reports. So there's nothing further to itemize. The reasons are their reasons, and maybe they disclosed them in Cambrian properly. Maybe they didn't, but there's no reason for a Vaughan index under these circumstances. That seems to make sense to me. Do you disagree? Well, no, Your Honor. I think you're correct with respect to Lyons check sheets of Lyons. They don't have to go this Lyons check sheet because this exemption, blah, blah, blah. What I'm concerned about, though, with respect to that is the fact that the whole basis of the decision in this case by the district court was based upon a sealed declaration that we don't get to contest. Part of the Weiner case and the Maricopa Audubon Society case, they talked about not only Vaughan indexes, but the major reason I cited those cases is they said that you have to make as much information public as you can before you ever start relying upon in-camera sealed affidavits. And here the whole basis, Ms. Anderson can't even argue the point because she's never seen the declaration. I can't argue the point because I haven't seen the declaration. Apparently, Your Honors have. The next quick thing is if you look at ER-9 and ER-17, which are my two FOIA requests with respect to Lyons' own line check sheets, it doesn't say in my request that I want the ones seized from Lyons. It says the USDA line check sheets for Lyons raisins during the years in question. It was Dr. Clayton, the USDA official, in denying my appeal from the FOIA officer's denial where he says, by the way, Judge Coyle already said that you could get copies of what was seized from your premises. He brought it up, not us. Our request was USDA line check sheets for Lyons raisins. Dr. Clayton says, you already got them or you can already get them from Coyle. Well, that's not what we asked for. So I wanted to dispel that rumor. Secondly, with respect to Judge DeSema's question regarding historical data, you assume that the product's already been shipped. The marketing order requires that once the inspection occurs, it has to be shipped out within five days. So what happened in 1999, within five days after that line check sheet, the product had to be shipped or it couldn't be shipped. So I wanted to dispel that rumor. The case that my colleague couldn't remember, it was the Lewis case that talked about doctoring evidence. Which case? Lewis, which is the one the district court relied upon. In the quote at my page 19, the affiance declaration, it says, further disclosure might enable Lewis to tamper with evidence which the IRS might subsequently request. We're asking for documents from USDA where USDA, on the other hand, has already seized them. How can we tamper with something that they've already got? With respect to their, you know, that they might subsequently request, they seized everything. So the Lewis case just doesn't make any sense. We can't tamper with anything that USDA already has and its historical nature. Well, you could, but as you say, it would be kind of foolish. Well, we invite prison, we do that. I mean, we're not idiots. And I'm not an idiot and I wouldn't let Lyon do that. But the whole point is, is the star chamber court that we're going through at USDA in the debarment proceeding, they are accusing us of falsifying, altering, forging. We believe that these documents not only would provide a defense to the criminal case, which I don't think they're ever going to indict. I mean, they seized this, they served the search warrant over three years ago. They haven't subpoenaed any grand jury witnesses as far as we know for years. But we need a defense to the debarment case. Debarring us from inspection puts us out of business because inspections are mandatory, incoming and outgoing. We, this star chamber court, the administrative law judge has no authority to issue subpoenas, otherwise we'd subpoena them. We're not entitled to discovery. All we get to see is what the government wants to give us on these six loads. If there are 200 other loads that show that USDA falsified or altered their own inspection certificates, their own line check sheets, they're the ones that have that information in their possession. They won't give it to us. How do we mount a defense? Thank you very much, Your Honors. All right. Thank you. We thank both counsel. And this case is submitted for decision. The next case on the argument calendar is Think It, Inc. Information Resource versus Sun Microsystems. Good morning, Your Honors.
judges: Tashima, Thomas, Silverman